UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO.  3:00CR263(JCH) |
| | : | |
| v. | : | |
| | : | |
| DAVID M. BURDEN | : | |
| a/k/a DAVID "DMX" BURDEN | : | JULY 21, 2005 |

**GOVERNMENT'S MEMORANDUM IN AID
OF POST-*CROSBY* PROCEEDINGS ON REMAND**

The Government respectfully submits this memorandum in response to the Court's Order

dated June 21, 2005, inviting written submissions from the parties on whether the Court should

have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory;

and otherwise in aid of proceedings on remand from the United States Court of Appeals for the

Second Circuit.

**I.      Procedural History**

On February 11, 2003, the defendant, David "DMX" Burden was convicted, following a

six-week jury trial, of (1) racketeering; (2) racketeering conspiracy; (3) VCAR conspiracy to

murder members of the Hill Crew; (4) the VCAR attempted murder of Fred Hatton and other

members of the Hill Crew; (5) a conspiracy to possess with intent to distribute and to distribute

five kilograms or more of cocaine and 50 grams or more of cocaine base; (6) four substantive

counts of possession with intent to distribute 5 grams or more of cocaine base; and (7) possession

of a firearm during and in relation to narcotics trafficking activity.

On November 24, 2003, the Court sentenced the defendant principally to a term of 292

months incarceration, followed by an additional 60 months, to run consecutive, as required by his

conviction for possession of a firearm during and in relation to narcotics trafficking activity,

pursuant to 18 U.S.C. §924(c).

On April 4, 2005, the United States Court of Appeals for the Second Circuit ordered a limited remand in this case, upon request of the Government, in light of the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005), and the Court of Appeals' decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).

On June 21, 2005, the Court issued an Order inviting simultaneous briefing from the parties on the question whether it would have imposed a non-trivially different sentence in the case if the Sentencing Guidelines had been advisory. The instant memorandum is the Government's submission in that regard.

## II.     Purpose of *Crosby* Remand

In Booker, the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. §3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 125 S. Ct. at 757. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." Id. At 765-66.

In Crosby, the Court of Appeals determined that it would remand most pending appeals involving challenges to sentences imposed prior to Booker "not for the purpose of a required resentencing, but only for the more limited purpose of permitting the sentencing judge to determine *whether* to resentence, now fully informed of the new sentencing regime, and if so, to

2

resentence." Crosby, 397 F.3d at 117.  In this respect, the Court of Appeals explained that a remand would be necessary to learn "whether a sentencing judge would have imposed a materially different sentence, *under the circumstances existing at the time of the original sentence*, if the judge had discharged his or her obligations under the post-Booker/Fanfan regime and counsel had availed themselves of their new opportunities to present relevant considerations."  Id. (emphasis added).

This statement of the purpose for Crosby remands makes clear that certain issues are simply irrelevant to this Court's determination whether to re-sentence.  Specifically, because this Court must determine whether to re-sentence based on "the circumstances existing at the time of the original sentence," id., arguments relating to post-sentencing factors are irrelevant.  In short, the court must determine whether it would have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory at the time of the original sentence, and under the circumstances existing at the time of the original sentence.

**III.   There is No Compelling Reason to Re-Sentence in this Case Because the Court Carefully Considered All of the Relevant Sentencing Considerations at the Time of Sentencing, Exercised Significant Discretion in Deviating from the Guideline Range Recommended by the PSR to Arrive at Its Sentence, and Already Chose Not to Exercise its Discretion to Depart on the Basis of Extraordinary Rehabilitation.**

Sentencing in the post-Booker regime, as explained in Crosby, now involves two analytic stages: first, a determination of the applicable Guidelines range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in 18 U.S.C. §3553(a), there is any reason to impose a non-Guidelines sentence.  Crosby, 397 F.3d at 113.  A review of the record in this case demonstrates that the Court already engaged in such an analysis and would not likely have imposed a non-trivially different sentence if the Sentencing

Guidelines had been advisory.

The district court in this case presided over nearly six weeks of evidence in a trial in January and February 2003. The court also reviewed and considered extensive briefing, and held extensive oral argument in connection with this, and other defendants' post-trial motions for judgment of acquittal and/or a new trial. During the course of those proceedings, as well as during other related proceedings, the court, on several occasions, noted its having extensively and thoroughly reviewed, and re-reviewed, the trial evidence and transcripts.

At the original sentencing in this case, the district court, well versed in the evidence at trial and the overall record, conducted a thorough analysis in reaching its determination of what it believed to be the appropriate Guidelines range for the defendant. Indeed, the district court held two sentencing hearings – one on October 20, 2003 and a continued sentencing hearing on November 24, 2003. At those hearings, the court carefully considered the defendant's arguments and ultimately agreed with certain of the defendant's arguments, disagreeing with the calculation in the PSR that the defendant was subject to Guidelines life and carefully arriving at a Guidelines range of 292 to 365 months.

Specifically, the defendant's Guidelines were calculated in the Pre-Sentence Report ("PSR") as follows. For Group One (Count One, Act One, Counts Twelve, Fourteen, Fifteen, Sixteen – Drug Conspiracy, Possession with Intent to Distribute and Distribution of Cocaine Base), the PSR calculated the base offense level at 38 because the offense involved more than 1.5 kilograms of cocaine base. The PSR ascribed a 2 level enhancement for possession of firearms in connection with the offense; awarded a 2 level enhancement for obstruction of justice; and attributed a 3 level enhancement for the defendant's role as a manager or supervisor of criminal

activity that involved either five or more participants or was otherwise extensive, resulting in a total adjusted offense level of 45. David "DMX" Burden PSR ¶51.

For Group Two, (Count One, Acts 5A, 5B, Counts Nine, and Ten – Conspiracy / Attempted Murder of Members of the Hill Crew), the PSR calculated the base offense level at 28 for attempted murder, and added a 2 level enhancement because a victim in the shooting, Arnold Blake, suffered serious bodily injury when he was shot in the leg, resulting in a total adjusted offense level of 30. David "DMX" Burden PSR ¶57.

In the Grouping analysis, one unit was assigned to Group One (the highest offense level of 45) and, because the offense level for Group Two was ten or more points lower, no additional units were added, resulting in no increase in the offense level. The PSR accordingly determined that the highest adjusted offense level and the combined adjusted offense level was 45, and set the total offense level at 43 pursuant to U.S.S.G. Chapter 5, Part A comment (n. 2) (in those rare cases involving a total offense level of more than 43, the total offense level is to be 43). An offense level of 43 and a Criminal History Category I, which the PSR calculated the defendant to be, resulted in a range of Guidelines life.

The defendant had no material objections to the factual statements in the PSR and, following a couple minor changes, the Court adopted the facts set forth in the PSR as its findings. See Transcript of David DMX Burden's Sentencing Hearing dated October 20, 2003 at 5-8.

The defendant, however, raised several issues of law in connection with the Guidelines calculation. First, the defendant objected to the enhancement for obstruction of justice and the Government opted not to press that issue. See, e.g., Sentencing Transcript, 10/20/03 at 9. In addition, the defendant objected to the role enhancement; advanced arguments regarding

5

sentencing disparities for cocaine and crack; and raised certain arguments in favor of a downward departure.

The Court heard extensive argument from the parties on the issue whether David DMX Burden's role in the offense was that of a manager or supervisor of criminal activity that involved either five or more participants or was otherwise extensive. See Sentencing Transcript, 10/20/03 at 10-29; 36-38. The Court also considered argument regarding the defendant's claims in connection with issues of cocaine versus crack cocaine. See Sentencing Transcript, 10/20/03 at 31-36; 38-46.

Ultimately, the district court rejected the defendant's claims regarding cocaine and crack, see Sentencing Transcript, 10/20/03 at 64-68; declined to award the defendant a two level adjustment for obstruction of justice, see Sentencing Transcript, 10/20/03 at 64; and declined to award the three-level upward adjustment recommended by the PSR pursuant to Guidelines Section 3A1.1(b) for David DMX Burden's role as a manager or supervisor of criminal activity that involved either five or more participants or was otherwise extensive, finding that there was insufficient evidence that the defendant personally supervised another person. Although it respectfully disagreed with the Court's conclusion on the issue, the Government notes that the Court's analysis in this regard was extraordinarily thorough, including extensive discussion of the relevant case law, the record evidence, and the court's findings on the issue. See, e.g.:

> The Court has spent quite a bit of time refreshing itself and its recollection about the trial evidence which, of course, occurred some months ago, including going back and rereading transcript(s) as it pertains to this particular defendant, and as well as looking at the transcripts of the telephone conversations that were taped involving this defendant's telephone. It does seem as if this defendant's position in the narcotics trade for Kelvin Burden varied over time.

6

Sentencing Transcript, 10/20/03 at 51.

> Again, the Court has searched the record and the Court's memory, in terms of having sat through the trial, and the Court does not really find evidence there, certainly not a preponderance of the evidence that David M. Burden ever supervised another person; that is, told him what to do or directed him what to do.

Sentencing Transcript, 10/20/03 at 57.

> The government does argue that by failing to give David M. Burden a role enhancement, he becomes or gets treated the same as the street-level defendants in the case, but I believe that's not a fair characterization of the sentencing outcome because the PSR does charge this defendant with the drug quantity of the entire organization, which results in obviously a much higher sentencing range than many of the other codefendants.
>
> The Court recognizes that the quantity of drugs for which the defendant is responsible under relevant conduct may be relevant in determining the defendant's role. U.S. v. Garvey, 905 F.2d 1144, at 1146 (8th Cir. 1990).
>
> However, while the Court agrees with the PSR's conclusion that the quantity of the entire organization was within the scope of this defendant's agreement and was foreseeable to him, as those terms are found in 1B1.3(a)(1)(B), which the defendant did not challenge here, it does not find that he further managed the organization of all that quantity. The preponderance of the evidence simply does not support that conclusion.

Sentencing Transcript, 10/20/03 at 62.

> The Court has likewise searched and finds that the evidence before the Court, and the Court's understanding and recollection of the three years – the evidence about the three years during – which this case has been pending, and the many weeks of testimony during trial and hearing, simply does not provide sufficient information from which this Court can find, by a preponderance of the evidence, that David M. Burden was a supervisor or manager, as those words are used in the meaning of 3B1.1(b).
>
> Therefore, the Court will decline to assess a management – an enhancement for role under 3B1.1(b).

Sentencing Transcript, 10/20/03 at 63-64.

> Accordingly, the Court went on to determine the applicable Guideline range as follows.

7

For Group One, the Court found a base offense level of 38 because the offense involved more than 1.5 kilograms of cocaine base. Sentencing Transcript, 10/20/03 at 68. The Court further applied a 2 level enhancement because the defendant possessed firearms in connection with the offense. Sentencing Transcript, 10/20/03 at 69. The Court therefore found the adjusted offense level to be 40.

For Group Two, having to do with the defendant's participation in the conspiracy and attempted murder of members of the Hill Crew, the Court found that he VCAR Guideline, U.S.S.G. § 2E1.1(a)(2), instructed the use of U.S.S.G. § 2A2.1(a)(1), which establishes a base offense level of 28 for attempted murder. The Court attributed an additional two levels to the defendant because one of his acts of violence resulted in serious bodily injury to victim Arnold Blake, who was shot in the leg. Accordingly, the Court found an adjusted offense level of 30 for Group Two. Sentencing Transcript at 69-70.

As opposed to the Guidelines life range set forth in the PSR, the Court then determined the applicable Guidelines range to be 292 to 365 months, as follows:

> Group 1 is at 40 and Group 2 is at 30. Under the guidelines when – obviously I assess one unit for Group 1, but I don't believe any additional unit should be assessed because the spread between the two groups is a ten, which is large than the spread at which units should be added.

> Therefore, the highest adjusted offense level of 40 would, in fact, be the total offense level for this defendant in connection with this – the conviction on the various counts that he faced with the jury.

> The Court notes that this defendant has no criminal history and, therefore, he is in a Criminal History Category 1.

> Level 40 and Criminal History Category 1 results in a guideline range of 292 to 265.

Sentencing Transcript at 70-71. The Court went on to note that, although it did not affect the

8

applicable Guidelines range, the defendant's conviction on Count Seventeen for possession of a firearm during and in relation to narcotics trafficking activity called for an additional 60 months, to run consecutive.

The district court carefully considered the issues before it in arriving at that range, and with respect to quantity, explained why it agreed with the PSR's conclusion that the quantity of the entire organization was within the scope of this defendant's agreement and was foreseeable to him:

> I guess if the objection is to my assessing against him, the entire, – what I would say is the entire quantity of the conspiracy where, with respect to other defendants, I did not assess the entire quantity, I did so in this case because while I did not give Mr. Burden a role enhancement, meaning I didn't find him to be a manager or supervisor, I do find that the evidence at trial established that he was involved in, if not every day of Kelvin Burden's organization, he was involved in a period of time with the distribution of the quantity that I found attributed to him. Whether he physically put that into somebody's hands or not, I think he probably did do that much quantity himself, but even if not, he was engaged with others, on a day-to-day basis, in doing that, whereas as other persons I found to be merely what I called "street dealers," i.e., people who were just selling their own quantity.
>
> Just so the record is . . . clear, the evidence, I think, was quite clear that he lived at the stash house along with others, and that as such he was there every day while purchases and sales were ongoing, and that if – that he himself was involved in the distribution to many street dealers, of significant quantities of drugs.
>
> . . . .
>
> . . . [T]o me, the record is pretty overwhelming that this defendant was involved in the distribution to a very large number of street dealers of crack cocaine over a significant period of time, and that just his own telephone conversations, which were a very limited period of time, would be supportive of the quantity the Court has just found, when taken over a longer period of time.

Sentencing Transcript at 73-75.

The Court then heard from counsel for the defendant regarding the appropriate sentence;

from various individuals who spoke on behalf of the defendant; as well as from the defendant himself. In addition, the Court went on to hear argument and to consider the defendant's motion for a downward departure based upon extraordinary rehabilitation through a religious calling. Although the government argued that there was no authority supporting such a departure, the government explicitly did not argue that such a departure was *per se* forbidden; instead arguing that the Court would perhaps have discretion to consider the departure if the circumstances were truly rehabilitative and extraordinary; and ultimately urging the Court not to exercise that discretion because the circumstances here did not warrant such a departure. See Sentencing Transcript, 10/20/2003 at 111. The Court then continued the hearing "to explore the case law some more before [making] a final decision on what will obviously have an enormous impact upon this defendant's life." Sentencing Transcript, 10/20/2003 at 114. The Court, however, remarked "[o]bviously, I've determined the sentencing guidelines. *Those are quite clear what they are*." Id. (emphasis added).

At the continued sentencing on November 24, 2003, the Court rejected the defendant's request for a downward departure, sentencing the defendant principally to a term of 292 months incarceration (the low end of the applicable Guidelines range), followed by an additional 60 months, to run consecutive, as required by his conviction for possession of a firearm during and in relation to narcotics trafficking activity.

During the continued hearing, the Government reiterated its belief that the Court did have the authority to depart on the grounds of extraordinary rehabilitation, but urged the Court not to do so as the circumstances in this case were not sufficiently extraordinary to warrant such a departure on the basis of the defendant's new found religious calling. See Sentencing Transcript

11/24/2003 at 14.

In carefully considering, but ultimately rejecting the defendant's claim for a downward departure for extraordinary rehabilitation as demonstrated by the defendant's new found religious calling, the Court first recognized its authority to depart on such grounds.  See, e.g., Sentencing Transcript at 19, and at 23 ("this Court, and it sounds as if the government doesn't dispute this but if it does, I'm still going to find this way anyway, that extraordinary rehabilitation as a possible ground to depart is not disqualified or prohibited simply because it is evidenced by a religious faith.").  The Court went on to state:

> That then leaves me with the question of whether Mr. Burden's rehabilitation is true and if it is, whether it's extraordinary . . . .
>
> And I, like the government, do not question that Mr. Burden has had a fundamental change in attitude, so I answer the first question that there is, rehabilitation has occurred, in the positive.

Sentencing Transcript, 11/24/2003 at 28.  In declining to exercise its discretion, however, the Court stated:

> It's my conclusion that, in this instance, I have the authority to depart because, theoretically, extraordinary rehabilitation, when it is extraordinary, is a factor that the guideline commission has not taken sufficiently into account.
>
> *However, in this instance, it's my decision, the exercise of my sound discretion, that I would decline to do so.*  I reach that conclusion for a number of reasons but before I explain those reasons, I wish to say to Mr. Burden that in doing so, I do not mean in any way to diminish what you've done to date in bringing yourself from a person who was driving around Norwalk, Connecticut, brandishing firearms and firing them at people and distributing or being a part of distributing enormous amounts of crack cocaine onto the streets of Norwalk for some period of time . . . .
>
> What I find troubling in this case, by way of being in the way of my ability to conclude that it was extraordinary rehabilitation are a number of things:

The first is that your change of mind, I'll call it . . . occurred at a time when you were under arrest or just released from being arrested and I think had to know, or at least the circumstances cause me to conclude that you had to know, that the federal government had the Burden group under investigation and that that was likely to lead to various serious consequences.

Further, I do credit the evidence that you referred former customers to Willie Prezzie and while it's not unusual that you would do that, as you chose to withdraw from drug dealing, it does call into question whether, in fact, your rehabilitation was there at the time.

Lastly, and this is a difficult one for me to explain, I hope I make this clear enough, you had and you continue to have, the absolute right to plead not guilty and to go to trial, and I'm not about to say that I could never find extraordinary rehabilitation in the face of someone who went to trial and I understand . . . that you didn't acknowledge or accept, shall I say, the legal theories advanced or the charges advanced against you.

However . . . there is no question that you were doing what I just recounted very briefly a moment ago, and that is you were quite at the center of and involved with a group of people who were moving a large quantity of illegal drugs to the streets of Norwalk and that you, yourself, were involved in viol[ent] crimes. The evidence was pretty overwhelming.

. . . I guess my view would be that a person who has been extraordinarily rehabilitated would have acknowledged, even if it was only in part, their culpability, their responsibility, for the conduct . . . .

Sentencing Transcript, 11/24/2003 at 28-30.

In explaining why it imposed a sentence of 292 months incarceration (the low end of the applicable Guidelines range), followed by an additional 60 months, the Court went on to state:

You were involved in a very large quantity of drugs and *you were yourself a person involved in a significant amount of violence.* I think one of your relatives wrote me and said you didn't kill anyone, and that's true. However, you were part of a group that led to the death of one person and the horrible crippling of another person.

You are just lucky you didn't kill anyone the night you were up at Carlton Court the night Arnold Blake got hit and a gun shot went through the wall of an apartment. And again, I don't know whether I call it luck or what it is, when everybody was firing at Richardson and Fred Hatton, that someone didn't get killed, most especially

12

an innocent bystander.

Sentencing Transcript, 11/24/2003 at 37-38 (emphasis added).

In light of the district court's careful consideration of all of the applicable sentencing issues at the original sentencing, and its having extensively and thoroughly reviewed the record evidence to carefully arrive at the sentence which it imposed – and the fact that the Court has already considered the defendant's claim of extraordinary rehabilitation *and declined to exercise its discretion to depart on that basis* – there is simply no compelling reason to revisit the Court's sentence with a resentencing. Given the exercise of the Court's discretion in the original sentencing, the record viewed in its totality does not suggest that the Court would have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory.

Perhaps more importantly, the Court's carefully considered sentence reflected not only the defendant's prolific narcotics trafficking activity, but also his associated acts of violence. In that regard, the defendant is in a significantly different posture than say, a defendant who stands before the Court merely with significant (albeit appropriate) quantities attributed to him, or a defendant who stands before the Court in such a posture with one or two prior sale convictions and faces severe (albeit arguably appropriate) sentencing exposure.

First, the fact that the defendant had no criminal history at the time of sentencing does not militate in favor of resentencing. Although at the time of sentencing the defendant had not sustained a number of prior criminal convictions, it bears noting that this defendant did not operate as a so-called "street level" dealer, where the risk of exposure, arrest and conviction is greater. In that regard, it is not unusual that the defendant, a higher-level member of the Burden Organization, stood before the Court without having yet sustained actual criminal convictions.

13

More importantly, however, as the Government highlighted at the original sentencing, although David "DMX" Burden was perhaps the most active or second-most active narcotics distributor in the Burden Organization, the defendant's involvement with the unlawful activities of the Burden Organization went well beyond the narcotics trafficking activities, extending to gun possession and full participation in acts of violence.  As noted above, among other things, the defendant stands convicted of racketeering; and racketeering conspiracy, including predicate acts that involved conspiracy to murder and attempted murder of members of the Hill Crew. This defendant also stands convicted of substantive VCAR counts, specifically, VCAR conspiracy to murder members of the Hill Crew; and the VCAR attempted murder of Fred Hatton and other members of the Hill Crew.

One of those incidents involved the defendant's personal participation in a retaliatory shooting, arising from the ongoing dispute between the Burden Organization and the Hill Crew on September 3, 1999, during which St. Clair Burden, David "QB" Burden, and this defendant opened fire in the area of Carlton Court in Norwalk, resulting in the shooting of Arnold Blake in the leg.  See, e.g., PSR ¶ 26; see also Ruling at 5 and at 45 ("There was substantial evidence to support the jury's finding that David M. Burden participated in the shooting.  Lavon Godfrey testified that Davd M. Burden planned the shooting at 27 Lincoln Avenue, left the apartment with a gun, and returned later, confessing to Godfrey that he had 'shot up the Hill.'  Anthony Burden also testified that David M. Burden recounted the events of the night sometime in the fall of 1999 and disclosed his participation in the incident.").

On October 10, 1999, members of the Burden Organization, remained intent on further violence against members of the Hill Crew.  On that date, Kelvin Burden spotted Hill Crew

14

members Rodrick Richardson and Fred Hatton in the area of Les' New Moon Cafe in Norwalk. Kelvin called David "DMX" Burden, told him about Richardson and Hatton's whereabouts, and instructed him to "come through." Subsequently, David "DMX" Burden, Cedric Burden and David "QB" Burden drove to Les' New Moon Cafe, where they engaged in a shoot out with Richardson and Hatton. See, e.g., PSR ¶ 26; see also Ruling at 6.

Almost a full year later, on September 10, 2000, David "DMX" Burden had an altercation with Cisco Betances, a major cocaine trafficker, near South Main Street in Norwalk. During the altercation, David "DMX" Burden brandished a loaded nine millimeter handgun, which was later recovered by Norwalk Police. Ballistics information confirmed that the same handgun was used in several other shootings, including a shootout at 27 Lincoln Avenue in March of 1998 and on September 3, 1999, when David "DMX" Burden and other members of the Burden Organization shot up Carlton Court. See, e.g., PSR ¶ 27; see also Ruling at 45-47.

The defendant was again arrested on December 4, 2000 in connection with threatening remarks he made on or about November 29, 2000 to witness Marquis Young, in connection with Young's anticipated testimony in the case that was tried in Connecticut Superior Court in December 2000 and January 2001. See, e.g., PSR ¶ 28.

That the defendant's criminal activities was by no means limited to his prolific narcotics trafficking was also highlighted in the final comments of the PSR, which not only noted his tendency towards, and participation in acts of violence, but also noted that this defendant had every opportunity and the socio-economic and family support to avoid his criminal conduct:

> Although his parents separated when he was a young child, the defendant was provided a loving, structured family environment, in which he formed close relationships with both of his parents, and his siblings. Unlike some of his cousins

/ codefendants in this case, the defendant graduated from high school, and attended college for a short period of time thereafter. He failed out of college, but did work at a number of different jobs. However, somewhere along the line, he *decided* to enter the illegitimate family business. Perhaps drawn by the fast money and fancy cars, *he made a commitment to the organization which, as evidenced by the jury's verdict in this case, utilized violence and intimidation, with lethal consequences*, in furtherance of the main racketeering enterprise, that being controlling the sale of cocaine base in South Norwalk. *The defendant's sister Kimberly is correct in that he did not kill anybody, but not for lack of trying.* The defendant was convicted of VCAR Conspiracy and Attempted Murder of members of the Hill Crew; and he did threaten Marquis Young, to dissuade him from testifying for the State in the trial for the murder of Derek Owens. The defendant was willing to not only sell cocaine base, but also to possess and use firearms if necessary.

. . . . this case isn't just about the drug quantity. It's about the organizational roles, the use of guns and violence, witness tampering, and the defendant's decision to go to trial.

PSR ¶¶ 96-97 (emphasis added).

As set forth in detail above, the totality of the record reflects that this Court carefully weighed all of the information available to it, including information concerning the defendant's background, character, conduct and his claim of extraordinary rehabilitation, prior to imposing sentence in this case. During the sentencing hearing, the Court indicated that it had considered the PSR and the defendant's sentencing memorandum; that it had read letters submitted by and on behalf of the defendant; and it similarly heard from individuals who spoke on behalf of the defendant, the arguments of counsel for the defendant, and statements from the defendant himself. The Court, exercising its discretion, ultimately decided not to follow the recommendations of the PSR and rejected five additional points (2 for obstruction of justice and 3 for leadership role), carefully arriving at a sentencing range of 292 to 365 months. The court then exercised its discretion not to depart, sentencing the defendant to the low end of the applicable Guidelines range. In short, on this record, it appears that the District Court carefully

16

considered the range of potential sentences, including a potentially available departure, and exercised its discretion in sentencing the defendant to the 292 (plus 5 years) term of imprisonment that it imposed.

Having said that, the government feels compelled, out of an abundance of caution, to note that certain of the Court's comments during the November 24, 2003 sentencing could arguably be construed as the Court's expressing a view that it was constrained by the Guidelines.  See, e.g., Sentencing Transcript, 11/24/2003 at 31-32 ("Perhaps I misspoke when I said I chose not to exercise my discretion.  I said that to acknowledge that I have the discretion but I don't find that the record really would support a finding of extraordinary rehabilitation, as required.  I want you to understand, Mr. Burden, it's as required by the law in connection with sentencing guidelines in this particular – I don't want to say technical but the legal requirements for such a finding.  The evidence here does not support that finding."); see also Sentencing Transcript, 11/24/2003 at 36-38 ("As I said earlier, Mr. Burden, I do appreciate the fact that I believe you have undergone a change in your life and I applaud you for that and, as I say, I hope that – obviously, the sentence I've imposed is a very long sentence.  It's a function of the fact that Congress has decided that their answer to drugs and the related violence of drugs, which is a scourge on our communities, is to lock people up and throw away the key . . . . I think all I can say to you is that the sentence I gave you, the range I gave it to you in, is a function of a lot of considerations that are in many respects driven by the law.  I did not feel that a departure had been established, a basis for a departure had been established here, and thus I was bound to sentence you within the guideline range, which I did at the low end of the range because I think it's plenty long enough.  I guess the only thing I can say to you is that I guess it's a reflection of the fact that I do believe you have

17

changed, is that I'm glad that the sentence that I had to impose upon you was not a life sentence .

. . .").  Because the Court did not say, for example, that *but for* the Guidelines, it would do

something different or, for example, that the Court wanted to sentence the defendant differently

but either could not do so or was prohibited from doing so by the operation of the Guidelines, it

is unclear, however, what the Court meant by its comments – (i.e., whether the Court was simply

explaining that a legal and reasonable basis for a departure had not been established and

therefore, such a departure was not appropriate or warranted; whether the Court was explaining

Congress' treatment of drug offenses *generally*, etc.).  Upon review of the entire record and the

totality of the circumstances – including this defendant's participation in serious and depraved

acts of violence –  the Government believes that the overall record suggests that the Court would

not have imposed a non-trivially different sentence if the Sentencing Guidelines had been

advisory.  The government nevertheless feels compelled to bring the Court's comments to its

attention out of an abundance of caution as the Court determines whether a resentencing is

required.  To the extent the Court agrees with the Government that having conducted a review of

the record and given the totality of "the circumstances existing at the time of the original

sentence," that the Court would not have imposed a non-trivially different sentence if the

Sentencing Guidelines had been advisory at the time of the original sentence, the Government

would respectfully request that the Court clarify in any ruling what it meant when making the

above comments.

**IV.    Under the Booker Sentencing Regime, the Sentence Imposed in this Case was a Reasonable and Just Sentence.**

Under the law as announced in <u>Booker</u> and <u>Crosby</u>, the defendant, David "DMX" Burden, received a just and reasonable sentence.  The Court sentenced the defendant in this case to a term of imprisonment within his Guidelines range.  <u>See</u> 18 U.S.C. § 3553(a)(4) (court must consider the defendant's Guidelines range).  As described above, the Court imposed this sentence only after considering the defendant's personal history and characteristics – including his apparent spritual rebirth – at the time of the original sentencing.  <u>Id</u>. § 3553(a)(1) (court must consider "the history and characteristics of the defendant").  Moreover, the Guidelines sentence ensured that the defendant received a term of imprisonment commensurate with other defendants, nationwide, who had similar records and committed similar offenses.  <u>Id.</u> § 3553(a)(6) (court must consider need to avoid unwarranted sentence disparities).

Finally, the sentence imposed in this case was reasonable because it served several purposes of punishment as identified in § 3553(a).  Specifically, the sentence in this case, a significant term at the bottom of the defendant's Guidelines range, reflected the "nature and circumstances of the offense," § 3553(a)(1) – including the serious acts of violence of which the defendant was convicted; the need for the sentence to provide "adequate deterrence to criminal conduct," § 3553(a)(2)(B); and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2)(A).  The defendant's prolific narcotics trafficking activities and the associated acts of violence had a significant and detrimental impact on the safety and well-being of the Norwalk community, as poignantly noted by the defendant's sister when she commented that the

19

defendant "did not kill anybody, but not for lack of trying," and by the Court when it told the

defendant:

> You were involved in a very large quantity of drugs and *you were yourself a person involved in a significant amount of violence.*  I think one of your relatives wrote me and said you didn't kill anyone, and that's true.  However, you were part of a group that led to the death of one person and the horrible crippling of another person.  You are just lucky you didn't kill anyone . . . .

In keeping with the violent, destructive and serious nature of the offenses, the need to provide

deterrence, and the need to promote respect for the law and provide "just punishment" for the

offenses, this Court properly sentenced the defendant to a term within his Guidelines range.  For

all of these reasons, the sentence imposed in this case was a just and reasonable sentence.

**V.    Conclusion**

For the foregoing reasons, in conformity with the procedures outlined in Crosby, this

Court should indicate, for the record, that after consideration of the defendant's Guidelines range

and all of the factors listed in 18 U.S.C. § 3553(a), the defendant should not be re-sentenced.


Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY



STEPHEN B. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT19105
UNITED STATES ATTORNEY'S OFFICE
915 LAFAYETTE BOULEVARD
BRIDGEPORT, CT 06604
(203) 696-3000
(203) 579-5575 (fax)
Stephen.Reynolds@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing was forwarded by mail on July 21, 2005 to:

Timothy Aspinwall, Esq.
Aspinwall & Aspinwall
3200 Main Street
Stratford, CT  06614

This is also to certify that a courtesy copy of the foregoing was hand-delivered on July 21,

2005 to:

    The Hon. Janet C. Hall
    United States District Judge
    United States Courthouse
    915 Lafayette Boulevard
    Bridgeport, Connecticut 06604

    Ray Lopez
    Senior United States Probation Officer
    U.S. Probation Office
    915 Lafayette Boulevard
    Bridgeport, Connecticut 06604

                              _____
                              STEPHEN B. REYNOLDS
                              ASSISTANT UNITED STATES ATTORNEY