Page 1

1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF CONNECTICUT

3    *  *  *  *  *  *  *  *  *  *  *  *Criminal No.3:00CR263(JCH)
                                      *
4    UNITED STATES OF AMERICA,        * November 24, 2003
                                      *
5             vs.                     * 10:00 o'clock a.m.
                                      *
6    DAVID M. BURDEN,                 *
                   Defendant          *
7                                     *
     *  *  *  *  *  *  *  *  *  *  *  * Bridgeport, CT
8                        SENTENCING

9            BEFORE THE HONORABLE JANET C. HALL
                UNITED STATES DISTRICT JUDGE
10   Appearances:

11   For the Government:        ROBERT M. APPLETON, ESQ.
                                Assistant U.S. Attorneys
12                              915 Lafayette Boulevard
                                Bridgeport, CT 06604
13
     For David M. Burden:       TIMOTHY P. ASPINWALL, ESQ.
14                              Aspinwall & Aspinwall
                                3200 Main Street
15                              Stratford, CT

16   For the Probation Office:  RAY LOPEZ
                                U.S. Probation Officer
17

18

19   Court Reporter            Thea Finkelstein, RMR, CRR
                                915 Lafayette Boulevard
20                              Bridgeport, CT 06604
                                (203) 384-6067
21

22

23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.

```
 1              THE COURT:  The record will reflect that the

 2    defendant has just been brought into the courtroom.

 3              Good morning, Mr. Burden.

 4              THE DEFENDANT:  Good morning.

 5              THE COURT:  We are here in the continued sentencing

 6    of David M. Burden, United States of America versus David M.

 7    Burden, docket No. 3:00CR263.  If I could have appearances,

 8    please.

 9              MR. APPLETON:  Good morning, your Honor, Robert

10    Appleton on behalf of the United States, your Honor.  With me

11    at counsel table is Assistant U.S. Attorney Brian Spears, and

12    Special Agent Dave Dillon, FBI.

13              THE COURT:  Good morning.

14              MR. ASPINWALL:  Good morning, your Honor.  Tim

15    Aspinwall for Mr. Burden.

16              THE COURT:  Good morning.  When we last recessed, I

17    believe that I had completed my determination of the

18    sentencing guideline range, which was level 40, criminal

19    history one, and that the issue that was pending was a

20    question of a downward departure for extraordinary

21    rehabilitation.

22              Since that time, I've received, through the

23    probation officer, a letter from the Wyatt facility

24    concerning Mr. Burden and I lost track of what else.  I know

25    there has been a suggestion that a witness would be called by
```

1    Mr. Aspinwall, and I believe there was a government's

2    memorandum, supplementing memorandum, in opposition to the

3    departure.  Is that everything that I should have gotten,

4    paperwise, anyway?

5              MR. APPLETON:  Yes, your Honor.

6              MR. ASPINWALL:   Yes, your Honor.

7              THE COURT:  Attorney Aspinwall, the government

8    raised some objections which I in effect overruled for the

9    moment in granting your request to bring someone in.  Is that

10   a person in the building?  Has he been brought today?

11             MR. ASPINWALL:  Yes, your Honor.  I already spoke

12   with him.

13             THE COURT:  What is his name?

14             MR. ASPINWALL:  Robert Gordon.  I think he's on his

15   way up.

16             THE COURT:  I don't know that he's on his way up

17   yet, is he?  Oh, okay.  Are there some issues concerning his

18   testifying?

19             MR. ASPINWALL:  Your Honor, I discussed it with

20   June Carlton at the facility on Friday, Thursday or Friday,

21   because I was going to go visit both Mr. Burden and he and

22   then I thought better of it.  My response to her was this:

23   She thought that counsel should be here, if I were to meet

24   with him at the facility, that perhaps counsel should be

25   notified.

1          My response to the government, my response to the

2     Court, is that I would be asking him questions merely about

3     what he -- what he, Mr. Burden, has had on his life and

4     others at the facility.  Absolutely nothing on the facts

5     surrounding his legal situation or his case.  I know he's

6     facing charges, he's going to be sentenced in May, for I

7     believe 50 grams or more of cocaine, he's looking at

8     somewhere between ten years and up.  He's already pled.

9          THE COURT:  Then he has a lawyer?

10         MR. ASPINWALL:  He has a lawyer.

11         THE COURT:  You didn't contact that lawyer?

12         MR. ASPINWALL:  I did not, your Honor.  She didn't

13    know who he was, I didn't really know how to ascertain that

14    but --

15         THE COURT:  I think you could have gone to the

16    clerk's office with his name and found the docket sheet and

17    then looked at who counsel was.

18         MR. ASPINWALL:  Well, your Honor, my point is I

19    don't intend to ask any questions that I think are unethical

20    in terms of questions about his case.

21         THE COURT:  Well, but I think, if it were your

22    client and he were called by somebody to testify, you would

23    want to at least assure yourself of that as his lawyer and

24    not let the other lawyer make that judgment.

25         MR. ASPINWALL:  I can tell your Honor that I did

1   speak to him this morning and asked him if he would be

2   willing to take the stand.  I think if your Honor were to

3   question him about what he were to testify here to today

4   without his lawyer, I think he would tell your Honor that he

5   would.

6           THE COURT:  But that's without advice of counsel.

7   If he talked to a lawyer and even though the lawyer said this

8   isn't a wise thing, he still chose to testify, that's one

9   thing but he has a lawyer, that's what probably bothers me

10  most of all.

11          If somebody came in without a lawyer, I might think

12  I could kind of not advise him but lay out what his concerns

13  and issues might be and let him make a judgment and if I was

14  confident he understood what I was saying, fine, we could

15  proceed, but he's a represented person.

16          MR. ASPINWALL:  He is, your Honor, and I can

17  proffer to the Court this:  That what testimony I would

18  elicit would be that Mr. Burden has had a profound effect not

19  only on him but on a number of other individuals at the

20  facility, and I'm not basing my argument strictly on

21  religious faith which --

22          THE COURT:  Let's not get into the argument.  I

23  guess let me hear from the government about the issue.  Is

24  Mr. Gordon testifying?

25          MR. APPLETON:  Yes, your Honor.  I have contacted

1    Paul Thomas, who represents the individual.

2              THE COURT:  Oh, he represents him.

3              MR. APPLETON:  Yes.

4              THE COURT:  I had gotten word about some contact.

5    I didn't know if that had just been because he's a public

6    defender that you contacted him.  He's actually his counsel.

7              MR. APPLETON:  Yes, in connection with his pending

8    case.  We spoke Thursday and Friday, we traded messages and I

9    outlined for Mr. Thomas the circumstance.  Mr. Thomas's

10   response to me was that Mr. Aspinwall had not contacted him,

11   he was unaware of the substance of the proposed testimony but

12   based on what I outlined, gave him a general flavor, although

13   we don't know exactly what's going to be the subject,

14   certainly, I asked Mr. Thomas -- he's unavailable this

15   morning, he apparently has something before your Honor at

16   1:00 o'clock.

17             THE COURT:  Well, it's now 12:00.  If he can get

18   here by --

19             MR. APPLETON:  He certainly did want to speak with

20   his client before his client goes on the stand.  Obviously,

21   as your Honor knows, no matter what the circumstances, if

22   this witness goes on the stand under oath, a whole host of

23   potential issues arise, not the least of which, you know,

24   he's at risk -- I'm not saying he would but he would be a

25   risk of, you know, perhaps maybe his circumstances were more

1    detrimental.

2        THE COURT:  You don't have to go into

3    circumstances.  I can imagine.  The government seemed to

4    propose a proffer.

5        MR. APPLETON:  Based on what I just heard, I don't

6    know if we would.  I think even with that information -- I'm

7    not sure what that information is but if it's to supplement

8    what was already provided in the last argument, that is

9    circumstances of what this defendant has done in Wyatt, I

10   don't know if we would oppose a proffer of that, depending on

11   what the information is.

12       THE COURT:  Well, I think I would be inclined to

13   want to proceed that way rather than to delay this because I

14   have other things this afternoon and we may not be able to

15   get it in if we wait for Mr. Thomas to come and then do his

16   proceeding.  And I can't remember what my afternoon is but I

17   know I have things scheduled.  I'm concerned about wanting to

18   complete the sentencing.

19       So I'm willing or I think would be helpful, I

20   guess, to take it by way of proffer now.

21       Unless you have an objection to that, Attorney

22   Aspinwall.

23       MR. ASPINWALL:  No, your Honor.  My understanding,

24   one of the comments that the Court made at the prior

25   sentencing hearing was that perhaps the Court thought it did

1   have authority to make a decision one way or the other but

2   didn't have a foundation, and I have talked to and I've sent

3   letters down to numerous individuals concerning Mr. Burden's

4   situation.  I've also spoken to June Carlton, who is the

5   program director at Wyatt.

6        Now, what I find, remarkably, your Honor, this

7   individual, meaning Mr. Burden, never brought any of this

8   information to me.  I actually had to investigate him and

9   find it out.

10       One of the things I think that's remarkable about

11  Mr. Burden's situation is that none of the, what he has been

12  doing at the facility is sanctioned by the facility.  In

13  other words, they're not programs that the facility offers.

14  He's done it merely on his own.  And I spoke to Mr. Gordon

15  this morning very quickly, he told me about his situation and

16  others.  I thought it was quite compelling.

17       He was down, literally, in a situation where he

18  said he wanted to kill himself and he, through Mr. Burden's

19  works, turned himself around, turned his whole life around.

20  He turned to God.  I asked him how often, how much, he said,

21  you know what?  Most guys got up, they have X number of hours

22  at the room where the TV is, I forgot the exact name of it,

23  and they usually play cards or watch TV.

24       What Mr. Burden would do, he said this is from the

25  early morning, early early morning hours to late at night, is

1  he would gather guys that were down and out and he would sit

2  them down with the Bible and he said through his works, his

3  help, he's absolutely turned his life around.

4         Now, I object to the government framing this as

5  simply as a religious argument because I think the cases that

6  I've read are quite clear that the Court, based strictly on

7  religious faith, cannot downwardly depart.

8         I would submit to the Court that this is a

9  situation where extraordinary moral rehabilitation has truly

10  occurred and I do not agree with a number of positions that

11  the government is taking.  I don't believe this is something

12  that is made up, your Honor.  I don't think it's something

13  that was made up merely because he was arrested.

14         He has, by his account, by his family's account and

15  those that I've spoken to at the facility, truly turned

16  himself around.

17         There's a point about -- and I spoke to Mr. Lopez,

18  who's the probation officer in this matter, and one of the

19  problems he had with, I know early on, well, if he changed

20  himself, morally rehabilitated himself, why didn't he admit

21  this to the Court?  Why didn't he -- this is in the

22  government's brief as well -- admit what he did was wrong and

23  move on?

24         From the very start, your Honor, with me, he

25  basically said he knew he was doing things out there that

1   were wrong.  What he disagreed with was the way that he was

2   charged, meaning the particular racketeering and organized

3   crime.  Certainly he said he was doing things wrong, he

4   acknowledged that to me early on, but disagreed legally,

5   conceptually, with how he was charged.  So I disagree with

6   the government's contention that there has been no admission.

7   He's admitted to me certainly that he was out there, living a

8   bad life, he was doing bad things.

9           If there's some language in the government's memo

10  that would seem to tend to argue that this is not genuine,

11  that his rehabilitative efforts are not genuine, I can tell

12  your Honor from my investigation, from speaking to people

13  such as Mr. Gordon, it truly is.  He has told me he's touched

14  not only his life but a number of other individuals and I

15  didn't know whether I should try to march a number of people

16  through the court, courthouse, to testify in front of your

17  Honor.  I did obviously ask for Mr. Gordon.  But he's a

18  representative of many that he has touched.

19          I've sent letters out to various individuals, some

20  of which have been transferred, some are in Otis.  There are

21  some still that are at Wyatt.  But, your Honor, I get the

22  same story.  The day room is the room I was trying to think

23  of.  He comes to the day room and rather than playing cards,

24  turning on the TV set, your Honor, he's helping these

25  individuals.  And it's not just one individual; it's a number

1    of individuals.

2            And again, I'm not arguing strictly a religious

3    argument here, your Honor.  I think that's part of it, it's

4    an aspect of it, and I think that your Honor can take it all

5    under consideration and make a finding that there certainly

6    is extraordinary moral rehabilitation here, your Honor.

7            He knows he's looking at a very long sentence one

8    way or the other and I think that this is one of the truly

9    exceptional cases that warrants a departure and I think it

10    does fit the bill and I would ask your Honor to consider a

11    downward departure based on, as I've said earlier,

12    extraordinary moral rehabilitation, your Honor.

13            Thank you.

14            THE COURT:  Thank you very much.

15            Attorney Appleton, I wanted to explore with you a

16    couple of issues.  My first question is, what's a base head?

17            MR. APPLETON:  With respect to the Lavon Godfrey

18    incident?  I believe he testified that there was, during the

19    course of Lavon Godfrey's testimony, that there was an

20    individual who was addicted to crack cocaine.

21            THE COURT:  I didn't remember him using that

22    phrase.

23            MR. APPLETON:  I believe he did.

24            THE COURT:  When I read it, I couldn't remember him

25    saying that and I couldn't figure out -- I guessed at what it

1    was.

2          Is it the government's position that the Court --

3    that the departure that the defendant requests is nothing

4    more than extraordinary acceptance of responsibility, which

5    is not permitted under the arguably pre-Protect Act but after

6    the Protect Act?

7          MR. APPLETON:  No.

8          THE COURT:  Okay.  Because I don't think that would

9    be right.

10         MR. APPLETON:  I think under extraordinary

11   rehabilitation still lives post Protect Act.

12         THE COURT:  And it's separate from acceptance.

13   There are a lot of cases that meld the two, when they talk

14   about extraordinary acceptance at a departure request, they

15   often slip into acceptance language but not so much in the

16   Second Circuit cases.  I think they have a very clear view of

17   extraordinary acceptance, as a recognized departure.  Okay.

18   I just want to be sure we were on the same ground there.

19         You had, I think, and I'm not certain because not

20   everyone in the courtroom remembers this so I'm not sure

21   where I got it from, I thought that you or Attorney Spears, I

22   can't remember, made a representation that there was evidence

23   that the defendant, Mr. Burden, had, while stopping his own

24   drug dealing after his release from prison, in jail, on bail

25   in April of 2001, had referred former customers to Willie

1    Prezzie.

2              MR. APPLETON:  I believe so, yes.

3              THE COURT:  And what's the source of that?

4              MR. APPLETON:  Two of the government's cooperators,

5    one Willie Prezzie and the other one was Frank Knight.

6              THE COURT:  Is it Frank Knight's statement that he

7    was sent by Mr. Burden to Willie Prezzie?  He would have been

8    a customer of Mr. Burden's, right?

9              MR. APPLETON:  Yes, your Honor.

10             THE COURT:  And then what was Prezzie's testimony,

11   confirming that Knight and others came to him after this

12   time?

13             MR. APPLETON:  Yes.

14             THE COURT:  Did he have a basis to know that they

15   came to him because of this defendant?

16             MR. APPLETON:  He being Prezzie?

17             THE COURT:  Prezzie, yes, I'm sorry.

18             MR. APPLETON:  I believe so, yes.

19             THE COURT:  How would he have known that?

20   Hearsay --

21             MR. APPLETON:  What the individual told him.

22             THE COURT:  When they came?

23             MR. APPLETON:  Right.

24             THE COURT:  All right.  In your supplemental memo,

25   you talk about the issue of religion as it relates to this

1   request, and it's clear in my mind that I cannot depart based
2   upon religion but I guess I would ask you whether you think I
3   have authority to depart if someone's extraordinary
4   rehabilitation is evidenced by their commitment to religion.
5           MR. APPLETON:  Well, as I think I indicated last
6   time when this was raised, your Honor, I believe, yes, the
7   Court does have authority to depart when there is
8   extraordinary rehabilitation that amounts to, constitutes an
9   extraordinary level, sufficient to qualify under the already
10  established premises that the Second Circuit's outlined.
11          I think just to be clear, the government's not
12  arguing that this is a prohibited departure.
13          THE COURT:  I see.
14          MR. APPLETON:  The argument is the specific
15  argument hasn't been recognized yet in the Second Circuit and
16  I think the government's argument is if confronted with it,
17  we don't believe the Second Circuit would agree with it, the
18  proffered basis.  Not that it's not possible but that it's
19  not extraordinary.
20          THE COURT:  So without acknowledging that the
21  Second Circuit's going to recognize as the Eighth Circuit did
22  in DeShon that such a departure exists with religion,
23  evidence of it, you don't feel it's been established in this
24  case, even if we started from the premises that the Second
25  Circuit recognized it?

1          MR. APPLETON:  Yes, your Honor.

2          THE COURT:  Do you want to, just in a nutshell

3    since we've had a break, remind me of the reasons why?

4          MR. APPLETON:  I think as some of the Second

5    Circuit cases have spoken about, which the government has

6    cited, just to clarify with -- I don't think the government's

7    argument is what's happening here is not genuine but it's got

8    to be looked at in context.  That is it was achieved as the

9    defendant states, his turn around was kind of achieved a week

10   or ten days after the search warrant that was conducted at

11   the house where the defendant was residing.

12         Clearly, it was clear that the search warrant was a

13   federal search warrant at the time.  The government's

14   argument is that not to pigeonhole only one circumstance

15   would be extraordinary but the post kind of once the

16   defendant realized that, you know, there was potentially

17   significant criminal exposure, lessens or weakens his

18   argument in the sense that it's based on what could be

19   perceived as a possible pending or impending prosecution.

20         Extraordinary, as I think the government represents

21   in its memo, would be something like if, one of the incidents

22   that the defendant -- during the course of the conspiracy,

23   one of the instances we think about, we look at for example

24   the shooting in Carlton Court where an innocent bystander was

25   struck by a bullet which this defendant was convicted of

1    attempting to commit murder in aid of racketeering, if the
2    defendant had achieved that kind of turn around that he just
3    removed himself and dissociated himself with the organization
4    and then, you know, achieved this level of commitment then
5    and continued with it and pulled himself out of the
6    organization, then he would have a stronger argument here.
7            But that's not what the circumstances are, and I
8    think simply a devotion to faith in the context of, you know,
9    post charging and presentencing circumstance, where
10   admirable, certainly it's, you know, it's something that we
11   are not criticizing by any stretch and it's something that is
12   admirable, which the defendant should do, does not on these
13   facts rise to the level of extraordinary.
14           I think there are a couple of cases the government
15   cites from the Seventh and Tenth Circuit, it's an
16   extraordinary remedy and moderate devotion to faith and
17   what's being proffered here does not rise to a level of
18   extraordinary.
19           I think one of the things, that's what the
20   government argues, you know, the 5K2.0 departure now
21   certainly is -- the Protect Act amendments are not
22   retroactive so it's not binding on the Court but clearly, the
23   effort by Congress is to limit the 5K2.0 departures to the
24   truly extraordinary exceptional circumstances.  The
25   government's argument here is, just on the facts, does not

1    rise to an extraordinary level.

2           THE COURT:  I make a comment that's not necessarily

3    relevant because the Protect Act, in my view, does not apply

4    to Mr. Burden's sentencing as you indicate, in agreement you

5    indicate.

6           MR. APPLETON:  Yes.

7           THE COURT:  I happen to think that what Congress

8    said is what I was operating on, and I think everyone else

9    is, is that departures were meant to be extraordinary.  Maybe

10   there have been some that weren't in the past but, I don't

11   know, I guess that was what I thought the word was that we

12   used in the Second Circuit, anyway.

13          In any event, do you wish -- thank you very much,

14   Attorney Appleton.  Do you wish to briefly -- well, to

15   respond, Mr. Aspinwall?

16          MR. ASPINWALL:  I do, your Honor.  Your Honor, I

17   think the point is not when this rehabilitation was achieved.

18   I don't think it matters when it was achieved; it matters

19   that it has been achieved.  That it has happened.

20          And secondly, this is not, this particular case is

21   not, a moderate level of devotion.  I believe it's a dramatic

22   level of devotion.  It's not an individual that's gone to

23   church on Sunday for an hour and saying, I'm helping others.

24   This is a guy that's at a facility that pretty much every

25   waking moment, is there in that day room trying to help

1    others.  I think the facts are very distinguishable, your

2    Honor.

3            THE COURT:  All right.  Part of the problem with

4    having two days of a hearing is that I lose track of where we

5    were.  I don't know, Mr. Burden, if I invited you to speak.

6            MR. ASPINWALL:  You did, your Honor.

7            THE COURT:  I thought I had done so but I wanted to

8    be certain I did not overlook that.

9            I am mindful, I actually went back and reread the

10   presentence report which has two letters in it from Mr.

11   Burden, one was to the probation officer early on and one was

12   to me.  Give me just a moment.

13           The defendant, David M. Burden, has requested a

14   departure based on extraordinary rehabilitation and that

15   raises a number of issues for the Court.  One is can

16   primarily post arrest activities provide a basis for such a

17   departure, I suppose in the first instance, whether such a

18   departure exists in the Second Circuit?

19           And in particular, that question arises not because

20   the Second Circuit hasn't recognized extraordinary

21   rehabilitation, indeed it has; but whether this aspect of,

22   I'll say, proof of the extraordinary rehabilitation by

23   evidence of a practice of a religious faith and whether

24   there's something about that evidence that can or cannot be

25   taken into account in consideration of such a departure.

1          And of course the most important question is

2    whether, in fact, the rehabilitation rises to the level of

3    extraordinary, as the law would require it to rise to, if I

4    were to grant such a departure.

5          I'm going to start first with the guidelines, which

6    provide that "a Court may impose a sentence outside the range

7    established by the applicable guidelines if the Court finds

8    'that there exists a mitigating circumstance of a kind or a

9    degree not adequately taken into consideration by the

10   Sentencing Commission in formulating the guidelines that

11   would result in a sentence different than that described in

12   the guidelines.'"  Sentencing guideline Section 5K2.0.

13         The Second Circuit has held that a sentencing judge

14   may exercise discretion and depart from the guidelines in

15   light of a defendant's efforts toward rehabilitation provided

16   those efforts are extraordinary.  United States versus

17   Bryson, 163 F.3d 742 at 747, Second Circuit 1998.

18         In determining if such a departure is warranted

19   because it is extraordinary, a District Court must examine

20   all of the pertinent circumstances associated with the

21   defendant's rehabilitation, United States versus Maier, 975

22   F.2d 944, at 948, Second Circuit, 1992.

23         As I understand the record that I have before me

24   that I'm considering, it is that there was an execution of a

25   federal search warrant on or about April 6th, I think, 2001

1   at the premises that Mr. David M. Burden was residing at,

2   along with several other people involved in the drug

3   conspiracy, most particularly Kelvin Burden; it was a house

4   owned in the name of Alqueen Burden, and it was the location

5   from which the drug dealing conspiracy operated, among other

6   things.

7           The execution of the search, as I say, led to the

8   arrest of this defendant on state charges, I believe, and he

9   was in jail for several days on state charges.

10          Subsequent to his release from that custody, he was

11  bailed out, he attended a church I believe with his sister,

12  and from that point forward, became a faithful attendee at

13  church and, in effect, professed that he had found his

14  religion there.

15          He was arrested several months subsequent to that

16  time and has been in custody ever since and while in custody,

17  has been active in, I will call it, a lay ministry, I hope

18  that's not offending you in any way, in a lay ministry in

19  prison at Wyatt, meeting with and working with other inmates

20  and is first for himself advancing his knowledge of the Bible

21  and his understanding of his faith and then working and

22  putting that knowledge to use in trying to assist other

23  inmates.

24          Obviously, there was a proffer today about Mr.

25  Gordon and I accept the representation of the defense counsel

1   that there are many other people who have benefitted from Mr.

2   Burden's efforts in helping them to focus on a religious

3   context for their life.

4          I also accept and find that the government is

5   correct about the record, that subsequent to his arrest in

6   April, it appears clear that this defendant did not continue

7   to deal drugs.  However, there is some evidence that he

8   directed persons who were seeking drugs to another source.

9          The Second Circuit has made it very clear to courts

10  like this one that I may consider post arrest rehabilitation

11  as a basis for an extraordinary rehabilitation departure.  In

12  U.S. versus Workman, the court said "post arrest

13  rehabilitation efforts by defendants may justify downward

14  departures under appropriate circumstances."  80 F.3d 688 at

15  701, Second Circuit, 1993.

16          I view Mr. Burden's rehabilitation, to the extent

17  it rests upon or is evidenced by his finding of religion or

18  finding of faith, to have occurred essentially post arrest.

19  It is not post arrest for the charges he faced in this

20  courtroom but he was, in fact, arrested the day of the search

21  warrant by the state officials and he was also aware, on that

22  date, that there were federal officers on the scene and

23  executing a federal warrant and based upon the evidence I

24  heard in this trial, as well as the one of Mr. St. Surin, it

25  seemed to be pretty well understood that there was a lot of,

Case 3:00-cr-00263-JCH     Document 1747-2     Filed 07/20/2005     Page 22 of 40

Page 22

1    I think it was referred to as heat around in light of the

2    fact that the feds had executed this warrant, and therefore,

3    as the First Circuit said in a case called U.S. versus

4    Craven, the defendant knew, that the "federal authorities

5    were at his door even if they didn't effect an arrest of him

6    on that date."

7           So essentially, the Court views this offer of

8    evidence of extraordinary rehabilitation as occurring post

9    arrest but, as I say, the Second Circuit permits the

10   departure even in the face of evidence merely post arrest.  I

11   do note that obviously in this instance, the defendant was

12   released for a short period of time, approximately the end of

13   April to the middle of June.

14          MR. APPLETON:  June 12th, your Honor.

15          THE COURT:  So it's about a month-and-a-half, but

16   that most of the period of time has been while he's been

17   incarcerated, that the evidence would come as to whether he

18   has been extraordinarily rehabilitated and in the Second

19   Circuit, again, the circuit has affirmed that in post

20   sentence context, departures can be based on rehabilitation

21   undertaken and demonstrated while incarcerated.  United

22   States versus Core, 125 F.3d, 74 at 76, Second Circuit, 1997.

23          Obviously, the Court understands that the

24   Sentencing Commission has amended Section 5K2.19 to

25   specifically prohibit post sentencing rehabilitation efforts

1    as evidence, which is where most of the incarceration cases

2    come from is post sentencing, but that doesn't affect this

3    case.

4            I think Core is still good law for the proposition

5    that merely because a defendant's incarcerated and not out on

6    the street and having to meet the challenges of being on the

7    street, as far as evidencing his rehabilitation, it doesn't

8    prohibit a defendant, doesn't prevent a defendant, from

9    seeking it merely because his evidence all comes from

10   incarceration post arrest environment.

11           I had been prepared to address the issue of

12   religion but I believe the government has indicated that they

13   are in agreement with me that although the guidelines at

14   5H1.10 clearly direct that religion is not relevant in the

15   determination of a sentence, and I believe the Second Circuit

16   has said, "it can never be used as a basis for departure,"

17   that's United States versus Sprei, S-P-R-E-I, 45 F.3d 528,

18   Second Circuit 1998.

19           However, this Court, and it sounds as if the

20   government doesn't dispute this but if it does, I'm still

21   going to find this way anyway, that extraordinary

22   rehabilitation as a possible ground to depart is not

23   disqualified or prohibited simply because it is evidenced by

24   a religious faith.

25           To me, it isn't because of a defendant's religion

1    that he would get this departure but his devotion to religion

2    and to the good acts that follow from being devoted to one's

3    religion can evidence the fact that, indeed, he has been

4    rehabilitated.

5         Obviously, it's a lot easier when a drug addict

6    becomes drug-free, there is physical evidence that he has

7    rehabilitated himself in a way that can often be

8    extraordinary and justify this departure, but I think that at

9    least theoretically, there is nothing to prevent the use of

10   evidence that involves the profession of or the practice of

11   one's religion as evidence that there has been an

12   extraordinary rehabilitation.

13        I think the DeShon case out of the Eighth Circuit

14   says that and at least as far as I've just put my view of it,

15   I believe that that is correct.  In DeShon, of course, the

16   Eighth Circuit affirmed a District Court's extraordinary

17   rehabilitation departure where, after the investigation began

18   but before there was an indictment of the defendant, the

19   defendant made a decision to radically alter his lifestyle

20   and renewed his life in the church, that's a quote, and

21   participated in counseling sessions at the church "virtually

22   every day."  183 F.3d 888, 890, Eighth Circuit, 1999.

23        These findings were based on testimony from

24   defendant's family members and his pastor as well, and his

25   pretrial services officer.  The circuit rejected the

1   government's argument there that the sole basis relied on to

2   show post offense rehabilitation was his proclaimed

3   commitment to a Christian lifestyle.  Id. at 889.

4           The court further rejected the argument where all

5   of the witnesses who testified at the hearing agreed that Mr.

6   DeShon's life "had changed completely and he is now a

7   different person."

8           The circuit explained that "while the transcript

9   contains religious references," the issue before the district

10  court was "not Mr. DeShon's religion or what motivated his

11  rehabilitative efforts.  Instead, the issue was whether his

12  rehabilitation was exceptional enough to be atypical of cases

13  in which the acceptance of responsibility reduction is

14  usually granted."  Id. at 890.

15          That, of course, is a perfect example of what I

16  commented on earlier with Attorney Appleton, which is that

17  some cases seem to slide from their analysis of extraordinary

18  rehabilitation into a discussion of acceptance, and

19  obviously, I don't believe that that is the correct analysis.

20          That's not to say that there isn't a relationship

21  between acceptance of responsibility and extraordinary

22  rehabilitation but in my mind, rehabilitation is a different

23  concept.  It's not necessarily connected to acceptance.

24  Thus, I don't view the Protect Act as presenting a bar here

25  to my exercise of discretion of this departure being present

1    and available to me.

2        There is a Second Circuit case decided in 2000,

3    United States versus Carpenter, in which it addressed the

4    question of extraordinary rehabilitation, it recounted its

5    prior cases such as Workman.  It pointed out the fact that

6    the Sentencing Commission is directed by statute to

7    "rehabilitation alone" as not a "extraordinary and compelling

8    reason for reducing a term of sentence for a defendant."

9    This defendant is already serving his sentence.

10        This was a post sentencing motion case, it's not

11    analogous to Mr. Burden's status right now but there was a

12    discussion about extraordinary rehabilitation.

13        That then leaves me with the question of whether

14    Mr. Burden's rehabilitation is true and if it is, whether

15    it's extraordinary.  In the First Circuit, in U.S. versus

16    Craven, the court said "the touchstone of extraordinary

17    rehabilitation is a fundamental change in attitude."

18        And I, like the government, do not question that

19    Mr. Burden has had a fundamental change in attitude, so I

20    answer the first question that there is, rehabilitation has

21    occurred in the positive.

22        However, the Court is mindful of a number of cases

23    which have addressed this departure and, for example, in

24    Core, Second Circuit case, said "the power to depart is to be

25    used sparingly and is reserved for unusual cases."  125 F.3d

1    at 79., quoting U.S. versus Williams, a Second Circuit case

2    from 1995.

3           "A defendant's rehabilitation is judged based on a

4    starting point," the Carpenter case, 320 F.3d 334.

5           The Second Circuit has recently pointed to two

6    cases as guideposts for district courts to consider when they

7    address extraordinary rehabilitation.  One is U.S. versus

8    Carpenter and the other is U.S. versus Workman.

9           In Workman, the defendant left the narcotics ring

10   that he was participating in before there were any arrests,

11   joined the United States Army, completed his military service

12   honorably before his arrest and conviction for his prior

13   criminal activity.  In affirming the departure, the Second

14   Circuit noted that "this rehabilitation was not undertaken at

15   the spur of an impending prosecution for the crimes at issue.

16   It was an independent and quite impressive effort."  Id. at

17   701.

18           Similarly, I'm sorry, the two cases that the court

19   in Carpenter cited were Workman and Corniell (phonetic).  In

20   Corniell, a former member of narcotics and fraud conspiracy,

21   in four years between the crime and his arrest, "returned to

22   college, was maintaining a high grade point average and was

23   working part-time as a volunteer counseling persons infected

24   with HIV."  That's Carpenter, 320 F.3d, 334, 344, Second

25   Circuit, 2003, discussing the Corniell case.  These two

1    cases, particularly the extent the Second Circuit has pointed

2    to them as cases to be considered in connection with this

3    departure, these cases obviously set the bar quite high.

4         Attorney Aspinwall argued at one point this morning

5    that it's not when the rehabilitation takes place but it's

6    that it has.  I agree with him in a sense of the finding of

7    has there been rehabilitation?  But I also believe that the

8    cases that have been decided in the Second Circuit strongly

9    suggest that there needs to be evidence present which justify

10   a finding of extraordinary.  I think some one of the cases

11   from the Second Circuit describe these cases as "rare as

12   hen's teeth."

13        It's my conclusion that, in this instance, I have

14   the authority to depart because, theoretically, extraordinary

15   rehabilitation, when it is extraordinary, is a factor that

16   the guideline commission has not taken sufficiently into

17   account.

18        However, in this instance, it's my decision, the

19   exercise of my sound discretion, that I would decline to do

20   so.  I reach that conclusion for a number of reasons but

21   before I explain those reasons, I wish to say to Mr. Burden

22   that in doing so, I do not mean in any way to diminish what

23   you've done to date in bringing yourself from a person who

24   was driving around Norwalk, Connecticut, brandishing firearms

25   and firing them at people and distributing or being a part of

1   distributing enormous amounts of crack cocaine onto the

2   streets of Norwalk for some period of time, that, as I say, I

3   credit what you have represented to me and said to me about

4   your change of mind and how you have viewed how you want to

5   live your life and to what you want to dedicate it.

6          However, I have an obligation to apply the law as

7   Congress has passed it and as the Second Circuit has directed

8   me in consideration of things such as departures, and what I

9   find troubling in this case, by way of being in the way of my

10  ability to conclude that it was extraordinary rehabilitation,

11  are a number of things:

12         The first is that your change of mind, I'll call

13  it, because I don't wish to talk always in religious terms

14  because to me, the fact that you have indicated your call to

15  a faith is evidence of a rehabilitation, and so I'll speak of

16  it in terms of the beginning of your rehabilitation occurred

17  at a time when you were under arrest or just released from

18  being arrested and I think had to know, at least the

19  circumstances cause me to conclude that you had to know, that

20  the federal government had the Burden group under

21  investigation and that that was likely to lead to various

22  serious consequences.

23         Further, I do credit the evidence that you referred

24  former customers to Willie Prezzie and while it's not unusual

25  that you would do that, as you chose to withdraw from drug

1    dealing, it does call into question whether, in fact, your

2    rehabilitation was there at that time.

3         Lastly, and this is a difficult one for me to

4    explain, I hope I make this clear enough, you had, and you

5    continue to have, the absolute right to plead not guilty and

6    to go to trial, and I'm not about to say that I could never

7    find extraordinary rehabilitation in the face of someone who

8    went to trial and I understand, as I think you have some

9    sense I had some questions about the government's theories

10   against certain of the defendants at least, that I understand

11   that you didn't acknowledge or accept, shall I say, the legal

12   theories advanced or the charges advanced against you.

13        However, well, maybe you won't admit this but in my

14   mind, there is no question that you were doing what I just

15   recounted very briefly a moment ago, and that is you were

16   quite at the center of and involved with a group of people

17   who were moving a large quantity of illegal drugs to the

18   streets of Norwalk and that you, yourself, were involved in

19   violate crimes.  The evidence was pretty overwhelming.

20        Obviously, the Court has no involvement in

21   discussions of changes of plea with the government, but I

22   guess my view would be that a person who has been

23   extraordinarily rehabilitated would have acknowledged, even

24   if it was only in part, their culpability, their

25   responsibility, for the conduct which lays at the base of

1    what the government's indictment is, and your choosing not to

2    do that, which again you have the absolute right to choose to

3    go to trial and to make the government prove their case and

4    possibly to win on appeal because the government has

5    overreached on certain legal theories as to what you are

6    guilty of.

7            But the fact remains that while, in my mind,

8    extraordinary rehabilitation is quite separate from

9    acceptance of responsibility, that to be rehabilitated needs

10   at some point a recognition that you have moved from a place

11   in your life that was wrong to a life that is better, and I

12   don't think you can do that without some public, in this case

13   it would be I suppose a plea of guilty but some public,

14   acknowledgment that the way you were living your life before

15   was wrong and you were rejecting that as you moved forward in

16   a rehabilitated state.

17           So for all of those reasons, the Court concludes

18   that the record here, under the standard, the very high

19   standard that the Second Circuit requires me to apply on this

20   departure, that I do not find that the record would support a

21   finding of extraordinary rehabilitation.

22           Perhaps I misspoke when I said I choose not to

23   exercise my discretion.  I said that to acknowledge that I

24   have the discretion but I don't find that the record really

25   would support a finding of extraordinary rehabilitation, as

1   required.

2           I want you to understand, Mr. Burden, it's as

3   required by the law in connection with sentencing guidelines

4   in this particular -- I don't want to say technical but the

5   legal requirements for such a finding.  The evidence here

6   does not support that finding.

7           Again, I'll repeat that I don't mean in any way to

8   diminish the fact that the Court does find that you are well

9   on the way to being rehabilitated, as evidenced by your

10  commitment to your faith and your sharing that with others

11  and helping others in the prison context.

12          And it would be my hope that for the time that you

13  are incarcerated, that you will continue to make positive use

14  of your time but, more importantly, to help others and then

15  therefore help yourself in coming to grips with the need to

16  change their lives, I guess, is the best way I can put it.

17          Unless there's anything further, the Court will

18  impose sentence at this time.  I believe just to refresh my

19  memory, the guideline range is level 40, criminal history

20  one, which is a range of 292 to 365.  Is that correct?

21          MR. APPLETON:  Yes, your Honor.

22          THE COURT:  Mr. Burden, I would ask if you would

23  please rise, sir, so that I may impose sentence.

24          It is the sentence of this Court to impose, on

25  counts One and Two of the third superceding indictment, a

1  sentence of 292 months; to impose upon you, under counts Nine

2  and Ten, a period of incarceration of ten years, to run

3  concurrent with the first sentence.

4        With respect to Count Twelve, to impose upon you a

5  term of imprisonment of ten years, to run consecutive to the

6  other counts.

7        And on counts Fourteen, Fifteen and Sixteen, to

8  impose upon you a term of five years, to run concurrent with

9  the other counts.

10        Lastly, on Count Seventeen, to impose upon you a

11  term of five years, which I'm required by law to impose as a

12  consecutive term.

13        With respect to supervised release, I'm going to

14  need some help from the probation officer, what the range

15  would be.

16        MR. LOPEZ:  I can put it on the record, if you

17  would like, your Honor.

18        THE COURT:  All right.  Excuse me for one moment, I

19  apparently misspoke.  When I spoke about the -- all of my

20  sentences that I articulated are concurrent sentences with

21  the exception of the last count, Seventeen, which, as I say,

22  by law must be consecutive.  So in effect it's a term of 292

23  months plus the five years consecutive.

24        Yes, Mr. Lopez.

25        MR. LOPEZ: The terms of supervised release for

1    counts One, Two, Twelve, Fourteen, Fifteen, and Sixteen under

2    the sentencing guidelines would be three to five years.

3           For counts Nine, Ten and Seventeen, two to three

4    years under the guidelines.

5           THE COURT:  All right.  Did you give me Fifteen?

6    That was Fourteen through Fifteen.

7           MR. LOPEZ:  Yes.  May I approach?

8           THE COURT:  Yes.  I apologize, since I didn't

9    depart, I cannot depart on any of the counts for guideline

10   purposes so -- I can't give 292 on Count Nine.

11          MR. LOPEZ:  Counts One, Two, Twelve, Fourteen,

12   Fifteen and Sixteen.

13          THE COURT:  Let me try this once again.  With

14   respect to counts One, Two, Fourteen, Fifteen and Sixteen,

15   the Court imposes 292 months, which is the low end of the

16   guideline range.

17          With respect to counts Nine and Ten, the Court

18   imposes ten years to be served concurrent to the prior

19   sentence.

20          And with respect to Count Seventeen, the Court

21   imposes five years to be served consecutive to those

22   sentences.

23          Is that correct, Mr. Lopez?

24          MR. LOPEZ:  Correct, and then with respect to

25   counts Twelve, Fourteen, Fifteen and Sixteen, also a sentence

1    of 292 concurrent.

2            THE COURT:  Correct.

3            With respect to supervised release, the Court

4    imposes a term of supervised release of five years on One,

5    Two, Twelve, Fifteen and Sixteen.  With respect to supervised

6    release under counts Nine, Ten and Seventeen, the Court

7    imposes three years, which is concurrent to the five years

8    previously imposed.

9            The Court determines that Mr. Burden has no assets

10   and therefore no fine should be imposed.  However, a special

11   assessment is required by law to be imposed of $100 on each

12   of the counts of conviction, which adds up to a special

13   assessment of $900.

14           With respect to the period of incarceration for Mr.

15   Burden, the Court, at the defendant's request, recommends to

16   the Bureau of Prisons that he be assigned to either Otisville

17   or Fairton, and the Court is also going to recommend that the

18   defendant be given the possibility of 500-hour substance

19   abuse treatment program within the Bureau of Prisons.

20           With respect to the period of the supervised

21   release, the Court imposes the standard conditions of

22   supervised release.  In addition, the Court imposes the

23   special condition that the defendant shall participate in

24   drug rehabilitation, either in or outpatient, as determined

25   by the probation officer, which shall include drug testing to

1    determine if the defendant is abusing any substances.

2            Are there any other special conditions you would

3    recommend?

4            MR. LOPEZ:  No, your Honor.  Thank you.

5            THE COURT:  Is there anything about the sentence

6    I've imposed that is unlawful, Attorney Appleton?

7            MR. APPLETON:  No, your Honor.

8            THE COURT:  Okay.

9            MR. ASPINWALL:  No, your Honor.

10            THE COURT:  Attorney Aspinwall, any other requests

11    or recommendations?

12            MR. ASPINWALL:  No.

13            THE COURT:  The Court needs to put on the record my

14    reasons for sentencing Mr. Burden at the lowest end of the

15    range of level 40 because the range of that guideline is more

16    than 24 months.

17            It's the Court's conclusion that a sentence of 292

18    months followed by 60 additional months on the gun charge is

19    more than adequate to achieve the goals of sentencing which

20    are to punish the defendant, to provide opportunities for

21    rehabilitation and to protect the community.

22            As I said earlier, Mr. Burden, I do appreciate the

23    fact that I believe you have undergone a change in your life

24    and I applaud you for that and, as I say, I hope that --

25    obviously the sentence I've imposed is a very long sentence.

1    It's a function of the fact that Congress has decided that

2    their answer to drugs and the related violence of drugs,

3    which is a scourge on our communities, is to lock people up

4    and throw away the key.

5         As I say, you were involved in a very large

6    quantity of drugs and you were yourself a person involved in

7    a significant amount of violence.  I think one of your

8    relatives wrote me and said you didn't kill anyone, and

9    that's true.  However, you were part of a group that led to

10   the death of one person and the horrible crippling of another

11   person.

12        You are just lucky you didn't kill anyone the night

13   you were up at Carlton Court the night Arnold Blake got hit

14   and a gunshot went through the wall of an apartment.  And

15   again, I don't know whether I call it luck or what it is,

16   when everybody was firing at Richardson and Fred Hatton, that

17   someone didn't get killed, most especially an innocent

18   bystander.

19        I think all I can say to you is that the sentence I

20   gave you, the range I gave it to you in, is a function of a

21   lot of considerations that are in many respects driven by the

22   law.

23        I did not feel that a departure had been

24   established, a basis for a departure had been established

25   here, and thus I was bound to sentence you within the

1    guideline range, which I did at the low end of the range

2    because I think it's plenty long enough.

3         I guess the only thing I can say to you is that I

4    guess it's a reflection of the fact that I do believe you

5    have changed, is that I'm glad that the sentence I had to

6    impose upon you was not a life sentence, and I think that all

7    I can say is that I know your family will continue to support

8    you, they have been there for you and it seems like it's a

9    wonderful family and I also think that you have your religion

10   now to be of support to you and I only hope that you make use

11   of the time that you are incarcerated in a positive way and

12   take satisfaction and joy from that.

13        It's not the environment obviously I think that you

14   would choose to be in but unfortunately it's the environment

15   that your conduct has led you to be required to be in.

16        Unless there's anything further -- I'm sure you

17   talked to your counsel about this but I have to be sure it's

18   on the record:  You have the right to appeal both the finding

19   of guilt, obviously, all the issues in the trial and my

20   rulings and you also have the right to appeal my sentence

21   that I've imposed today.

22        Obviously, you are represented by counsel, you

23   should speak with counsel about an appeal, but even if, when

24   I got off the bench, he said I don't want to help you

25   anymore, I'm not going to be involved anymore, you can file a

1  notice of appeal yourself. Just a simple sheet of paper, I

2  appeal in this case, and there is a filing fee but if you say

3  I can't pay the fee, the clerk will accept it anyway.

4          The important thing that you need to know is that

5  the right to appeal lasts a very short time, just lasts ten

6  days, and if you don't file that notice within the ten days,

7  you lose your right to appeal forever. So I think you want

8  to be certain that that notice gets filed in the next ten

9  days, but do you understand that? If you don't file it in

10  the next ten days, you've lost your right to appeal?

11          THE DEFENDANT:  Yes.

12          THE COURT:  All right, sir.

13          Is there anything further?

14          MR. APPLETON:  No, your Honor.

15          MR. ASPINWALL:  No, your Honor.

16          THE COURT:  Thank you all very much, and we'll

17  stand in recess.

18          (11:15 o'clock a.m.)

19

20      COURT REPORTER'S TRANSCRIPT CERTIFICATE

21          I hereby certify that the within
        and foregoing is a true and correct transcript
22      taken from the proceedings in the above-entitled
        matter.
23

24                      Official Court Reporter
    Dated:
25

6-27-05

Hi Cilla,

Wow, I know its been along time since I have written and my calling has been a little off but I think of you everyday and I always mention you in my prayers. I love you both! As for me I'm well, our LORD is doing a wonderful work in my life and I'm so thankful. PRAISE GOD! Last Friday I preached a word under the anointing it was awesome, a beautiful experience all for His glory. I've been waiting for this moment, an last month I really sought the LORD for it and the brothers prophesied that the anointing would come through the laying on of hands. About a week later the anointing fell on the service an few of the brothers layed their hands on me, the next morning I woke up in the spirit on fire. Hallelujah! It manifest last Friday I spoke with power about obedience it was called "WHOSE GONNA PRAISE GOD WITH ME TONIGHT" ☺ I wish you could've been there. The spirit was moving after I finish the Pastor from outside was on fire He continued in the same spirit we had a good time. GOD is AWESOME! I'm still a work undone but HE is perfecting me daily and I love it. So you see you don't have to worry when you don't hear from me cause our LORD is keeping me. Amen! I'll be home soon my time here is complete, continue pressing and praising that we can all give GOD His glory together for He is worthy.

Love Always,
David

P.S

You see your silly nephew ☺